SYKES *v.* CAMPBELL.

5-30                                                     256 S. W. 2d 320

Opinion delivered March 30, 1953.

*J. B. Milham,* for appellant.

*Max M. Smith,* for appellee.

WARD, Justice.    The principal question involved on this appeal is the mental capacity of Edgar Hunter to convey his property in return for services to be rendered by appellants.

Mr. and Mrs. Hunter, who were elderly and unable to properly look after themselves, lived at New Edinburg on a small farm which belonged to Mr. Hunter.    In addition to the farm there was certain personal property consisting of household goods and a small amount of money about which there is some question as to ownership.    Mrs. Hunter owned four cows in her own right, but there is also a question about what disposition, if any, was made of them before her death on October 27, 1951.

In June, 1951, Mrs. Hunter wrote her foster daughter, Mrs. Sykes, who was living with her husband in Illinois, to the effect that if she and her husband would come to New Edinburg and take care of her and Mr. Hunter they would, at the deaths of her and Mr. Hunter, get the farm and household furniture. Appellants, Mr. and Mrs. Sykes, moved into the Hunter home in the early part of July, 1951, and now contend they accepted and have complied with all the provisions of the offer made by Mrs. Hunter, and further contend that Mr. Hunter verbally consented and agreed to the arrangement. On November 5, 1951, Mr. Hunter purported to execute a will and an ''agreement'' by which Thelma Sykes was to get all his property.

Later Mr. Hunter was officially adjudged insane and this suit was filed January 29, 1952, by appellants against his heirs and guardian to enforce the terms of the first contract and also the ''agreement.''

The trial court dismissed appellants' complaint on the ground that Mr. Hunter was mentally incapable of making the alleged contract or the ''agreement'' and that he had been mentally incompetent at least since June 10, 1951. If Mr. Hunter was incompetent on June 10, 1951, he could not have consented to the terms contained in Mrs. Hunter's first letter to Mrs. Sykes which was dated June 20, 1951, and, of course, was not capable of executing the will and ''agreement'' which are dated November 5th, but which appellants allege were executed September 10th.

The testimony regarding Mr. Hunter's mental capacity was sharply conflicting, but we cannot say the finding of the chancellor on this issue was against the weight of the evidence. Lay witnesses testified that Mr. Hunter was able to drive a car some and do ordinary chores although he was old and in feeble health, and that in their opinion he had mental capacity to consent to the contract and execute the ''agreement.'' On the other hand a large number of lay witnesses held a contrary view and gave facts upon which such views were based. Two doctors testified.

Dr. Holder, whose qualifications were admitted, had known Mr. Hunter for fifteen years and had treated him several times up to 1949. He stated the nature of Mr. Hunter's mental weakness was senile psychosis. He testified, in part, as follows:

"Q. Would you say whether or not, in your opinion, he had sufficient mental capacity within the last 18 months to understand and appreciate ordinary business transactions? A. No sir."

. . . .

"Q. In your opinion, can you say, would he have had sufficient mental capacity to make a contract, make a will, or any other instrument disposing of his property any time within the last 18 months? A. No, sir. Q. Was his type of mental condition a progressive condition? A. Yes, sir."

Dr. Carnahan, a psychiatrist and assistant superintendent of the State Hospital, whose qualifications were also admitted, examined Mr. Hunter December 11, 1951, and made a report of his findings the following day, which, among other things, showed the following:

"V. *Sensorium and Intellectual Resources:* The patient's orientation was nil. He neither knew the time, place, nor person. Memory, both remote and recent, was nil; retention and recall were nil; counting and calculation were nil; grasp of general information was nil; judgment was nil.

"VI. *Insight:* Entirely lacking."

Dr. Carnahan stated that Mr. Hunter was suffering from a major mental illness, senile psychosis, which was progressive, and, in addition, gave the following answers to the questions set out below:

"Q. Basing your answer on your examination of Mr. Hunter, and your findings at that time, and your knowledge of that type of illness, state whether or not, in your opinion, Mr. Hunter would have been capable of making contracts, executing wills, and disposing of his property generally, at that time? A. He definitely

would not have been capable at that time. Q. Basing your answer upon your knowledge of this type of mental diseases, in your opinion, would he have been capable of making such contracts at any time within a period of 12 months prior to the date of your examination? A. It is impossible to say exactly, but it is very improbable he would have been competent. He would not have been competent six months prior to my examination, and based on my examination of him, I would say it is questionable about whether he would have been competent for a longer period before. But definitely, not competent for six months prior to my examination. Q. At any time? A. At any time, yes, sir.''

Some other issues were raised but, in view of the decision we have reached, it would serve no useful purpose to discuss them in detail. They are:

*One:* After the decision of the lower court Mrs. Sykes filed a claim in probate court in the matter of the guardianship of Mr. Hunter for services rendered and money spent in his behalf, and appellees have filed a motion here to dismiss this appeal on that ground. We have chosen to make our decision on the merits and so do not pass on the motion.

*Two:* Mrs. Sykes contends that in any event she is entitled to all personal property of Mrs. Hunter, deceased, since she was bound by their agreement. We agree that the offer of Mrs. Hunter expressed in two letters was accepted by appellants moving into the Hunter home and rendering the enumerated services, but we are unable to tell exactly what the personal property consists of at this time or at the time of the hearing. While the letters only mentioned household goods [in addition to realty], yet Mrs. Sykes testified that her foster mother told her she would give her all her personal property, and we treat the pleadings as amended to that extent. Only three items of personalty are mentioned, as discussed below:

*Household Goods:* We find no testimony describing this item in detail or to show who owned it, but numer-

ous articles are listed in the inventory filed in the guardianship estate of Mr. Hunter.

*Money:* There is inconclusive testimony regarding a small amount of money either on hand at the death of Mrs. Hunter or in the bank at New Edinburg, or both. The inventory above referred to shows $158.03 in said bank but does not show in whose name or names. It appears that $1,000 was deposited in the bank several months previously in the joint account of Mr. and Mrs. Hunter, but the disposition of this deposit is not shown.

*Cows:* While, as before stated, Mrs. Hunter had four cows, yet it appears she sold three before her death. The evidence does not show what disposition was made of the proceeds. Also, some cattle is listed in the said inventory.

It is our decision that appellants are entitled to whatever personal property Mrs. Hunter had at the time of her death, and this cause is remanded so that the trial court may entertain further proceedings in this connection.

Affirmed as above indicated and reversed in part for further proceedings not inconsistent with this opinion.